**GREYHOUND CORPORATION,
Petitioner,**

v.

**INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.**

**No. 80–1271.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 18, 1981.

Decided Nov. 6, 1981.

E. Barrett Prettyman, Jr., Washington, D.C., with whom Philip A. Bjorlo, Washington, D.C., was on the brief, for petitioner. W. L. McCracken, Phoenix, Ariz., also entered an appearance for petitioner.

Robert B. Nicholson, Atty., U. S. Dept. of Justice, Washington, D.C., with whom Sanford M. Litvack, Asst. Atty. Gen., Washington, D.C., was on the brief, for respondent U.S.

Lawrence H. Richmond, Atty., I.C.C., Washington, D.C., for respondent ICC. Richard A. Allen, Gen. Counsel, and Kathleen M. Dollar, Deputy Associate Gen. Counsel, I.C.C., Washington, D.C., were on the brief, for respondent ICC.

Before WRIGHT, TAMM and GINSBURG, Circuit Judges.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

Petitioner in this direct review proceeding challenges an order of the Interstate Commerce Commission (Commission or ICC) entered on remand from a previous decision of this court, *Greyhound Corp. v. Interstate Commerce Commission*, 551 F.2d 414 (D.C.Cir. 1977). The primary issue in this case is whether the Commission's continued exercise of its securities jurisdiction over Greyhound Corporation (Greyhound) fails to conform to the mandate of this court. Also involved is the validity of the Commission's imposition of a dividend restriction on Greyhound Lines, Inc. (Lines), a subsidiary of Greyhound Corporation. Be-

cause we find that the Commission has again failed to explain adequately its deviation from precedent concerning its securities jurisdiction and that there is no "good cause" justifying a dividend restriction at this time, we set aside the order of the Commission.

## I. BACKGROUND

### A. *This Court's Prior Decision*

The Commission is empowered by the Interstate Commerce Act (the Act), 49 U.S.C. § 1 *et seq.* (1976)[1], section 5(4),[2] to treat a noncarrier holding company that acquires "control" over a carrier as a carrier subject to the reporting, accounting, and securities regulations of the Act.[3] In 1963 Greyhound, with the approval of the Commission, transferred its transportation rights and properties to a subsidiary, Greyhound Lines, Inc., thereby becoming a noncarrier holding company subject to Commission regulation. Because Greyhound's principal source of income was to derive from carrier operations and closely related activities, the Commission subjected Greyhound to the accounting, reporting and securities provisions of the Act. *California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, 93 M.C.C. 392, 395 (1963). In 1970, as a condition upon Greyhound's acquisition of Armour and Company, the Commission, acting within its authority under section 5(2) of the Act,[4] restricted Lines' ability to engage in certain intercompany financial transactions.[5] Beginning in 1963, Greyhound actively pursued a course of diversification and in 1972 petitioned the Commission for modification of the 1963 order. Premised on the ground that Greyhound's principal source of income no longer derived from transportation and related activities, the petition sought removal of the regulation of Greyhound's securities. The Commission denied the petition in an unpublished order. *California Parlor Car Tours Co.—Pur.— Greyhound Corp.*, No. MC–F–8531 (ICC Div. 3, Mar. 21, 1974), Joint Appendix (J.A.) at 51–52 [hereinafter *1974 Order*].

The *1974 Order* stated that continued regulation of Greyhound was justified by the fact that its principal source of *net* income was from transportation or related activities and that the subsidiary carrier represented a large segment of the passenger surface transportation industry. *Id.*

1. The Interstate Commerce Act (the Act), 49 U.S.C. § 1, *et seq.* (1976), was repealed on October 17, 1978, by Public Law 95–473, 92 Stat. 1337, which enacted a new Title 49. The Act now appears at 49 U.S.C. § 10101 *et seq.* (Supp. III, 1979). Because the orders of the Interstate Commerce Commission (Commission or ICC) in this case refer to the sections in the prior codification, we will also refer to those sections for ease of reference, giving a cross-reference to the new codification where appropriate.

2. Section 5(4), now § 11348, provides in pertinent part: "Whenever a person which is not a carrier is authorized, by an order entered under paragraph (2) of this section, to acquire control of any carrier . . . such person thereafter shall, to the extent provided by the Commission in such order, be considered as a carrier. . . ." 49 U.S.C. § 5(4) (1976).

3. 49 U.S.C. §§ 20(1) to (10); 304(a)(1) and (2); 320 and 913 contain the accounting and reporting provisions. Sections 20a(2) to (11) contain the securities regulations governing carriers. Section 314 provides that a noncarrier holding company is subject to the same provisions of § 20a. In the new codification, the accounting, reporting, and securities regulations to which a noncarrier may be subject are listed in § 11348, 49 U.S.C. § 11348 (Supp. III, 1979).

4. The pertinent provision of section 5(2)(b) (now contained in section 11344) provides:

 If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope [of the Act] and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable. 49 U.S.C. § 5(2)(b) (1976).

5. Lines was forbidden, without express approval of the Commission, from (1) declaring or paying any dividends, (2) making any advances to affiliated companies, (3) encumbering any of its assets for noncarrier purposes, or (4) engaging in any other intercompany property transactions. *Greyhound Corp. Securities*, 336 I.C.C. 575, 583 (1970). The restriction on declaring or paying any dividends was lifted a short time later. *Greyhound Corp. Securities*, Finance Docket No. 25982 (ICC Div. 3, Apr. 27, 1970), Joint Appendix (J.A.) at 49–50.

On petition for review, this court found that the ICC had changed the standard governing the regulation decision from a 50 percent of *gross* income test to something less than 50 percent of *net* income test without explanation. *Greyhound*, 551 F.2d at 417. The court also found that the Commission had deviated from the precedents established in cases involving holding companies similar to Greyhound. *Id.* The case was accordingly remanded to the Commission with directions to rectify or explain the deviations. *Id.* at 418.

### B. The 1978 Order

Following remand, the Commission reopened the proceedings and solicited comments from interested parties.[6] *California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, No. MC–F–8531 (ICC Div. 3, Aug. 12, 1977), J.A. at 55. Comments were received,[7] and in October 1978 the Commission issued an order setting forth its determination that continued regulation of Greyhound was justified. *California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, 127 M.C.C. 343 (1978) [hereinafter *1978 Order*]. The Commission again reopened the proceeding and, in addition, reopened an unrelated proceeding, *Greyhound Corp. Securities*, Finance Docket No. 25982,[8] "to consider the approximate mix of section 5(2)

conditions and securities regulation under the present circumstances." *1978 Order*, 127 M.C.C. at 357. As an interim solution, the Commission modified its securities jurisdiction to require that Greyhound obtain prior approval only for security issuances or assumed obligations that "will significantly affect its carrier subsidiaries. . . ." *Id.* In all other cases Greyhound was permitted to file "letter petitions to waive the security jurisdiction." *Id.*

### C. The 1979 Order

The reopened proceedings resulted in the order that is the subject of this petition. *California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, 127 M.C.C. 605 (1979) [hereinafter *1979 Order*]. The Commission reaffirmed the conclusions reached in the *1978 Order*, incorporated the reasoning of that decision, adopted the interim solution with one modification,[9] and imposed a further restriction—that Lines could not declare or pay any dividends in excess of 70 percent of its net income available for dividends without prior Commission approval. *1979 Order*, 127 M.C.C. at 615.

### D. The Current Petition

On petition for review of the *1979 Order*,[10] Greyhound contends that the portion

---

**6.** The Commission sought answers to the following questions:

1. What criteria should be applied in determining whether a non-carrier holding company should be considered a carrier and subjected to the provisions of Sections 20a and 214 of the Interstate Commerce Act?

2. Do Greyhound Corporation and its subsidiaries occupy a *sui generis* position in the motor carrier bus industry?

3. If it is found that Greyhound does occupy a *sui generis* position in the motor carrier bus industry, must the criteria applicable to other carriers be applied to the Greyhound Corporation and its subsidiaries in order to subject them to the provisions of Sections 20a and 214 of the Interstate Commerce Act?

*California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, No. MC–F–8531 (ICC Div. 3, Aug. 12, 1977), J.A. at 55.

**7.** Comments were received from Greyhound, Pepsico, Inc., Trailways, Inc., and the Commission's Bureau of Investigation and Enforcement (BIE). Brief for Respondent ICC at 5.

**8.** *Greyhound Corp. Securities*, Finance Docket No. 25982, involved Greyhound's acquisition of Armour and Company. It was in this proceeding that the Commission conditioned the acquisition on the imposition of certain restrictions. *See* note 5 and accompanying text, *supra.*

**9.** The Commission determined that it was not necessary for Greyhound to file a "letter petition" to waive security jurisdiction if the issuance or obligation was unrelated to the carrier subsidiaries. *California Parlor Car Tours Co.—Pur.—Greyhound Corp.*, 127 M.C.C. 605, 615 (1979) [hereinafter *1979 Order*].

**10.** As noted above, the *1979 Order* incorporated the reasoning and conclusions contained in the *1978 Order*. Accordingly, only the *1979 Order* is the subject of this petition for review. We will refer to each order separately, however, where necessary to indicate specific conclusions or arguments espoused by the Commission.

of the order continuing the exercise of securities jurisdiction must be set aside as contrary to the 1977 mandate of this court. In addition, Greyhound argues that imposition of a dividend restriction on Lines is an abuse of the Commission's discretion and constitutes arbitrary and capricious action. As an independent ground, Greyhound contends that the Commission's order must be set aside in its entirety because excessive delay in resolving the case violates the fifth amendment of the Constitution and the Administrative Procedure Act. Our resolution of the securities and dividend issues makes it unnecessary for us to address Greyhound's latter contention.

## II. DISCUSSION

 The order at issue here is the product of informal rule-making and accordingly must be reviewed under the "rational basis" test.[11] A reviewing court, however, will accord a somewhat greater degree of scrutiny to an order that arrives at substantially the same conclusion as an order previously remanded by the same court. *See Food Marketing Institute v. ICC*, 587 F.2d 1285, 1289–90 (D.C.Cir. 1978). "[W]e must recognize the danger that an agency, having reached a particular result, may become so committed to that result as to resist engaging in any genuine reconsideration of the issues." *Id.* at 1290.

### A. Securities Jurisdiction

The Commission's *1978 Order* analyzed the question whether Greyhound should be subject to extensive regulation by considering two issues: first, whether the holding company should be treated as a carrier under section 5(4) of the Act and subject to securities regulation; and second, if so, the extent of regulation required to protect the carrier subsidiaries.

Our 1977 decision in this very case noted that agencies are required to adhere to their own precedents or to explain any deviation. *Greyhound*, 551 F.2d at 416. As the Supreme Court has noted, "A settled course of behavior embodies the agency's informed

judgment that, by pursuing that course, it will carry out the policies committed to it by Congress." *Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1972). In its *1978 Order* the Commission stated that the purpose of section 5(4) is to prevent unregulated holding companies from jeopardizing the financial stability of the transportation subsidiaries. 127 M.C.C. at 347. The ICC has traditionally used a "primary interest in transportation" test, and its adjunct "principal source of income" test, to determine whether regulation of a noncarrier holding company is justified. *See, e.g., Lease Plan International Corp.—Control—National Trailer Convoy, Inc.*, 93 M.C.C. 203, 207 (1963); *Wells Fargo Armored Service Corp.—Control—Armored Motor Service Co., Inc.*, 75 M.C.C. 285, 295 (1958). The use of these standards suggests a policy judgment by the Commission that not all holding companies controlling carriers should be subject to ICC securities regulation. Prior ICC decisions involving this issue indicate that imposition of burdensome securities regulation is justified only when a holding company is considered primarily in the business of transportation or primarily interested in transportation because of financial involvement with a carrier subsidiary. In its *1978 Order*, however, the Commission concluded that in pursuing its statutory objective, "it is *irrelevant* whether the holding company is primarily involved in transportation; the impact on the transportation system is the same. It is the *nature of the carrier* controlled by the holding company that we should examine." *Id.* (emphasis added). This position marks a radical departure from Commission precedent.

Just one month before its *1978 Order* in Greyhound, the Commission, considering whether United Parcel Service, Inc., should be treated as a carrier under section 5(4), stated that "[t]he board correctly relied on the 'primarily business test' . . . . The Commission consistently has held that when

---

11. Review is limited to determination of whether the Commission's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . ." 5 U.S.C. § 706(2)(A) (1976). *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1024 (D.C.Cir. 1978).

a noncarrier corporation is engaged substantially in transportation activities ... the act requires that such company be treated as a motor carrier ...." *United Parcel Service, Inc. (Ohio)—Merger—United Parcel Service, Inc., (New York)*, 127 M.C.C. 292, 297 (1978). As recently as September 1980, the Commission reaffirmed the vitality of the "primary interest" test. In *Georgia Highway Express, Inc.—Pur.—Western Transportation Co.*, 127 M.C.C. 721 (1980), the Commission stated that two general tests are available to determine whether imposition of securities jurisdiction on a holding company is appropriate. One of these tests was the "primary interest" test [12] the Commission had declared irrelevant nearly two years earlier. Although the Commission also applied a "substantial effect on transportation" test in *Georgia Highway*, it is clear that the exercise of securities jurisdiction was based on the finding that the holding company, as "the alter ego of [the carrier], should be subjected to the securities requirements ... of the Interstate Commerce Act." *Id.* at 723.[13]

The importance of reasoned decisionmaking in an agency action cannot be over-emphasized. When an agency such as the ICC is vested with discretion to impose restrictions on an entity's freedom to conduct its business, the agency must exercise that discretion in a well-reasoned, consistent, and evenhanded manner. *See Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). The Commission cannot endorse the "primary interest" test in September, declare it irrelevant in October of the same year, and remain faithful to these principles. These diametrically opposed statements, made only one month apart, are not reconciled by the Commission; indeed, the Commission does not even attempt a reconciliation but instead insists that it is "not singling out

Greyhound for regulation under different standards than those applied to other carriers. The criteria developed over the years have been used." *1978 Order*, 127 M.C.C. at 352.

Having stated in the *1978 Order* that an inquiry into the primary interest of the holding company was irrelevant, the Commission proceeded to list criteria that it did consider relevant to the regulatory decision. Such criteria were said to include the holding company's principal source of income, the extent of the holding company's investment in the carrier subsidiary, the percent of the holding company's consolidated gross assets derived from noncarrier activities, the extent to which the holding company's activities are unrelated to transportation, and the size and nature of the carrier and its influence on national transportation. *1978 Order*, 127 M.C.C. at 350. All but the last of these criteria relate directly to the holding company and the extent that its income, investments, assets and activities are derived from or related to the carrier subsidiary. Although the ICC stated that it is "the nature of the carrier" that should be examined, *1978 Order*, 127 M.C.C. at 347, it did not explain how the listed criteria aid that examination.

The Commission instead relied on only one of the listed criteria—the size and nature of the carrier and its influence on national transportation—as justification for the imposition of securities jurisdiction over Greyhound. Noting that the loss of services of a large carrier would disrupt the national transportation system, the Commission summarily concluded: *"Lines is the largest member of the bus industry. Some regulation of its noncarrier holding company is necessary to protect the carrier subsidiary." 1978 Order*, 127 M.C.C. at 351 (emphasis added). We do not dispute the fact

---

**12.** In *Georgia Highway Express, Inc.—Pur.—Western Transp. Co.*, 127 M.C.C. 721 (1980), the Commission stated that the test was "whether the holding company is substantially engaged in transportation activities ..." and "the primary business test." 127 M.C.C. at 722. We are unable to discern any substantive

difference in the tests regardless of the terminology used.

**13.** The holding company's principal source of income and 90 percent of its assets were transportation-related. *Georgia Highway Express, Inc.—Pur.—Western Transp. Co.*, 127 M.C.C. 721, 722 (1980).

that the carrier's position in the industry is an important factor to be considered. When it is the *only* factor applied, however, the Commission is obligated to provide more than a mere conclusion. One searches the *1978 Order* in vain for an adequate explanation of why this criterion alone justifies the imposition of the Commission's securities jurisdiction.

■ The Commission did not find that Lines is *sui generis* in the industry,[14] nor did it rely on any other factual distinctions that might warrant novel treatment in this case. Instead, the Commission stated "whether or not we believe Lines is *sui generis*, its impact on the industry is so great that its actions, and those of its parent, must be scrutinized to the extent directed by Congress." *1978 Order*, 127 M.C.C. at 352.

The Commission insisted that its shift to a "substantial effect on transportation" test was neither abrupt nor unexplained. Two administrative cases were cited in support of this proposition. In *Illinois Central Gulf Railroad—Acquisition—Gulf, Mobile & Ohio Railroad*, 338 I.C.C. 805 (1971), the Commission did, it is true, impose securities jurisdiction based on the effect on transportation; in so doing, however, it relied on another decision, the rationale of which the Commission, at least arguably, subsequently repudiated. In *International Utilities of the U.S., Inc.—Control—Pacific Intermountain Express Co.*, 116 M.C.C. 66 (1971), the Commission imposed its securities jurisdiction based on the fact that the holding company would "have an influence upon the national transportation which is immediate in effect and wide in scope." *International Utilities*, 116 M.C.C. at 81. As noted by petitioner, however, the Commission suspended its securities jurisdiction over International Utilities in 1972. Brief for Petitioner at 25–26. The unpublished suspension order does not provide the reasoning

behind the decision, *International Utilities of the U.S., Inc.—Control—Pacific Intermountain Express Co.*, No. MC–F–10795 (ICC Div. 3, June 7, 1972), J.A. at 167, nor does the Commission offer any explanation or even comment on the case in its brief. We find that, absent any explanation, the Commission's reliance on the reasoning in an order that has not been in effect since 1972 is misplaced.

The absence of any explanation of the supposed logical connection between the actions of the holding company and the resulting effect on the carrier subsidiaries is disturbing. If the Commission could support the inference, which is implicit in the use of the "size and nature of the carrier" criterion, that the actions of a holding company are more likely to affect a carrier whose impact on national transportation is substantial than a carrier with little or no impact, we feel it would have done so. The Commission's new emphasis on the effect on national transportation also implies that a carrier with a substantial impact is in greater need of protection than other carriers. It is not unreasonable, however, to arrive at the opposite conclusion—that a carrier that commands a top position in its industry needs less protection than a smaller, less successful competitor.

We need not speculate further on the rationale behind the Commission's change of standards. "Whatever the ground for the departure from prior norms ... it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka & Santa Fe*, 412 U.S. at 808, 93 S.Ct. at 2375. The Commission has failed to follow this fundamental principle of administrative law.

The Commission enumerates four factors that, when applied to Greyhound, purport-

---

14. The Commission, in its brief and at oral argument before this court, insists that it did, at least in part, rely on Greyhound's unique position in the industry. Brief for Respondent ICC at 26–27. Neither the *1978* nor the *1979 Order* support this contention. Although the *1979 Order* makes passing reference to Lines' "unique and significant position," *1979 Order*,

127 M.C.C. at 611, it is clear from the *1978 Order* that the Commission did not rely on any finding that Greyhound or Lines were unique or *sui generis*. An agency decision must, of course, stand or fall on the reasons articulated in the decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943).

edly justify the extent of regulation: the importance of the carrier to the parent company, Greyhound's past record of corporate abuses, the threat created by other subsidiaries competing for parent company financial resources, and the position of the bus industry in general. *1978 Order*, 127 M.C.C. at 353–56. Although the Commission points to these factors as relevant in determining the *extent* of regulation, it concludes, "[c]onsidering all of these factors, we find the retention of our 5(4) jurisdiction over Greyhound is justified." *Id.* at 356. It is unclear from the order whether the factors noted above relate to the decision to regulate or only to the extent of that regulation. Accordingly, we will also examine these factors to ascertain whether they might provide an independent basis for continuation of securities regulation in this case.

■ Broad generalizations about the state of the industry or the potential threats posed by other subsidiaries and parent actions, either taken alone or in conjunction with other factors, cannot justify the imposition of onerous regulatory burdens. These factors apply with equal force to all companies in the surface passenger industry and all parent/subsidiary relationships. Any reliance on such factors must be accompanied by a reasoned analysis of their relation to Greyhound and their relevance to the securities regulation decision. If continued regulation of Greyhound's securities is justified in this case, it must be based on a reasoned analysis of the two other factors presented by the Commission.

The Commission does not rely, as indeed it cannot, on the "importance of the carrier to the parent." This factor appears to be the "primary interest" test swathed in new clothing. As our 1977 decision implied, under the "primary interest" test or "principal source of income" test, Greyhound would escape the ICC's securities jurisdiction. *See Greyhound*, 551 F.2d at 417.

■ We are thus left with the past improper behavior rationale for continued jur-

isdiction. The Commission places great emphasis on Greyhound's prior behavior as justification for the continued regulation. The behavior at issue, however, occurred between 1965 and 1969. *1978 Order*, 127 M.C.C. at 353–54. There is no indication or suggestion that Greyhound has engaged in improper conduct or questionable practices since that time. Moreover, in 1970 the Commission restricted certain financial transactions between Lines and Greyhound in order to monitor the activities that had led to the 1965–69 abuses. *See Greyhound Corp. Securities*, 336 I.C.C. 575, 583 (1970). The Commission did not find in the *1978 Order*, and does not now suggest, that the 1970 restrictions have been ineffective. We conclude that, absent additional facts, reliance on the 1965–69 behavior of Greyhound is unreasonable.

In sum, we find that the Commission has failed to explain adequately its rejection of the primary interest test and subsequent adoption of the "substantial effect on transportation" test as the sole criterion for continuing the exercise of securities jurisdiction over Greyhound. We can only conclude that the portion of the Commission's order continuing securities regulation must be set aside.

### B. *The Dividend Restriction*

In addition to continuing its securities jurisdiction over Greyhound, the Commission imposed a restriction on the ability of Lines to declare or pay any dividends in excess of 70 percent of its net income available for dividends. *1979 Order*, 127 M.C.C. at 614. The restriction was imposed under section 5(2) of the Act as a condition to the continuation of the Commission's 1963 approval of Greyhound's control of Lines. *Id.*

Greyhound's challenge to this condition rests on three grounds: first, it contends that the Commission's order failed to show "good cause" for modification of the 1963 order as required by section 5(10) of the Act;[15] second, it argues that the criteria

---

**15.** Section 5(10), now § 11351, provides: "The Commission may from time to time, for good cause shown, make such orders, supplemental

to any order made under paragraphs (1), (2), or (7), of this section, as it may deem necessary or appropriate." 49 U.S.C. § 5(10) (1976).

applied and the timing of the imposition of the restriction deviate from Commission precedent without adequate explanation; and, finally, it submits that the Commission has shown absolutely no justification for the restriction. We feel that the two latter contentions are inextricably intertwined with the section 5(10) claim. Accordingly, our discussion will be limited to the meaning of the "good cause" requirement and whether "good cause" existed at the time the *1979 Order* was entered.

■ The *1979 Order* does not contain a discussion of or citation to any provision of the Act that confers authority on the ICC to modify the 1963 control order. In its brief, the Commission avers that its power to modify or correct any of its orders is very broad and is in fact unlimited. Sections 17(7) and 16(6) of the Act are cited in support of this assertion.[16] Brief for Respondent ICC at 33–34. Although these provisions do confer wide discretion on the ICC, we need not explore the limitations on the exercise of discretion under those sections. We are faced with a statute that contains a provision granting wide discretion and a provision expressly limiting discretion in specific circumstances. We believe that the only reasonable interpretation of the statute requires that when the specified circumstances occur, the more restrictive of the two provisions must apply. Accordingly, when orders previously entered under section 5(2) are to be modified or

supplemented, section 5(10), which expressly limits the Commission's normally wide discretion to cases where "good cause" exists,[17] is the applicable provision.

■■ It is axiomatic that all words and provisions of a statute are presumed to have meaning and are to be given effect. *Wilderness Society v. Morton,* 479 F.2d 842, 856 (D.C.Cir.), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (1973). In determining the meaning of the "good cause" requirement, we are persuaded that the language of the statute requires some event or change in circumstances which necessitates a supplementation or modification of a section 5(2) order before the Commission is authorized to act. *See Chesapeake & Ohio Railway v. United States,* 571 F.2d 1190, 1204 (D.C.Cir. 1977) (MacKinnon, J., dissenting).[18] Accordingly, we find that the existence of "good cause" is a jurisdictional prerequisite to the Commission's authority to supplement or modify a section 5(2) order.

■ We now turn to the question of whether the agency has shown "good cause" to exist in this case. The fact that the Commission did not make an explicit finding of "good cause" is not itself a sufficient reason to set aside the order. "Although agency action must be set forth with sufficient clarity so that courts do not have to guess at the underlying theories relied on, this Court has recognized judicial indulgence toward administrative action to

---

**16.** Section 17(7), now § 10322(g), of the Act provides in part: "[i]f after rehearing, reargument, or reconsideration of a decision . . . it shall appear that the original decision . . . is in any respect unjust or unwarranted, the Commission . . . may reverse, change, or modify the same accordingly." 49 U.S.C. § 17(7) (1976).

Section 16(6), now § 10324, provides: "The Commission shall be authorized to suspend or modify its orders upon such notice and in such manner as it shall deem proper." 49 U.S.C. § 16(6) (1976).

**17.** The Commission argues that the 1978 recodification of the Interstate Commerce Act somehow changed the "good cause" requirement in section 5(10), now § 11351, and not, we note, § 11701(a) as the parties erroneously *suggest. The Commission states that the* "good cause" requirement was deleted from the provision in the new Act as "unnecessary."

Brief for Respondent ICC at 32–33. While the word "good" was deleted from the text of the section, the Act continues to require that "cause" exists. The Commission has not provided any argument to persuade us that there is any substantive difference between "good cause" and "cause," and we assume, without deciding, that there is no such difference.

**18.** *Chesapeake & Ohio Ry. Co. v. United States,* 571 F.2d 1190 (D.C.Cir. 1977), involved the issue of whether an ICC order which fell within the limitations of § 5(10) was a "modification" or merely a clarification of a prior order. The court found that the order in question merely clarified ambiguities of a prior order, and that no showing of "good cause" was necessary. *Id.* at 1193–94. There is no question that the order before us in the present case represents a substantive modification of the 1963 order.

the extent of affirming an order when an agency's path, though convoluted, can be discerned." *Midwestern Gas Transmission Co. v. Federal Energy Regulatory Commission*, 589 F.2d 603, 615 (D.C.Cir. 1978) (per curiam) (footnotes omitted). If the Commission has articulated reasons that rise to the level of "good cause" for modifying its prior order, its decision should be affirmed. Given the facts and circumstances presented in this case, however, we are unable to find that any of the reasons given by the Commission in support of imposing the dividend restriction at this time constitute "good cause."

The Commission's decision appears to be based on two factors: that the relaxation of its securities jurisdiction over Greyhound in 1978 dictates a need for additional safeguards and that "the cash-generating capability of Lines ... represent[s] a fertile area for potential abuse." *1979 Order*, 127 M.C.C. at 613. In its brief before this court, the Commission also asserts that its avowed objective—"to reach a regulatory solution that would provide better monitoring and protection of Lines' financial stability, while intruding as little as possible on Greyhound's business transactions"—is sufficient in itself to constitute "good cause." Brief for Respondent ICC at 33.

Before turning to these factors, we note that in its brief and at oral argument the Commission contended that Greyhound's prior behavior justified the dividend restriction. *See* Brief for Respondent ICC at 37–38. A careful reading of the *1979 Order*, however, suggests that this consideration played little, if any, role in the decision. The only direct reference to Greyhound's prior behavior appears immediately following the Commission's adoption and incorporation of the *1978 Order*.

In view of the unhealthy impact which certain of Greyhound's previous financial transactions have had upon Lines, and the fact that Lines holds a unique and significant position in the passenger bus transportation industry, we believe that the public interest would best be served by some form of continued Commission monitoring of the financial relationship between Greyhound and Lines.

*1979 Order*, 127 M.C.C. at 611 (footnote omitted). It is unclear whether this summary relates to the *1978 Order* concerning securities jurisdiction or to the analysis of the dividend restriction that follows the reference. In light of the absence of any further direct reference [19] in the *1979 Order* to prior behavior, we believe the sentence is merely a summary of the reasoning contained in the *1978 Order*. If the imposition of the dividend restriction was based on Greyhound's past improper conduct, the Commission has failed to make a clear statement to that effect. In any event, as we stated earlier, it is unreasonable for the Commission to rely on behavior that occurred long ago, without some showing suggesting that the improper conduct has occurred or is likely to occur again. This is particularly true where, as in this case, the Commission lifted a similar dividend restriction *after* the improper conduct occurred. *See* note 4, *supra*.

Nor does the relaxation of the Commission's securities jurisdiction over Greyhound constitute "good cause" for imposing a dividend restriction on Lines. The Commission has not shown that a relaxation of securities regulation of the parent company has even a remote relation to the dividends paid by a subsidiary. Indeed, the Commission itself notes with apparent approval the finding by the ICC's Bureau of Investigation and Enforcement that the authority to impose conditions under section 5(2) and the authority to regulate security issuances are not coextensive, but are sepa-

---

**19.** The only other reference to Greyhound's past behavior occurs in the context of establishing the threshold of allowable dividend payments before Commission approval is required. After examining the dividend history between Lines and Greyhound, the Commission set the threshold at 70% rather than the more restrictive 50% limit suggested by BIE. *1979 Order*,

127 M.C.C. at 613. We hardly think the comment refers to prior *abusive* dividend history; if it had, it is more likely that the Commission would have imposed the more restrictive limitation. At any rate, absent further explanation, it is unreasonable for the Commission to rely on this cryptic reference to the dividend history as a justification for the dividend restriction.

rate and distinct. *1979 Order*, 127 M.C.C. at 611.

■ The Commission's primary justification for the dividend restriction is that there is a "potential for abuse." This potential for abuse, the Commission finds, "is sufficient to justify some degree of regulation . . . over the dividend cash flow from Lines to Greyhound." *1979 Order*, 127 M.C.C. at 613. The Commission does not distinguish the potential for abuse it finds in the Greyhound/Lines relationship from the potential for abuse that is inherent in any parent/subsidiary relationship. It points to no facts peculiar to Greyhound or Lines suggesting that this potential is more likely to crystallize in that case than in any other. Although the Commission could have pointed to the existence of particular facts or financial conditions that might justify the imposition of additional restrictions on intercompany financial transactions, as it has done on other occasions,[20] it has not done so. To accept the Commission's reasoning that a mere "potential for abuse" is sufficient to allow the reopening of section 5(2) proceedings would render the "good cause" provision of section 5(10) a nullity—a potential for abuse exists in every case.

■ Following the same reasoning, the Commission's general objective of reaching a balanced regulatory solution cannot satisfy the "good cause" requirement. We assume the ICC strives to reach a balanced regulatory solution in every case. Something more than a general objective applicable to all cases is required in order to give effect to the good cause provision.

The Commission has failed to make a finding that "good cause" exists for modification of the 1963 control order and has failed to provide any articulated justification that can be considered "good cause" or provide a basis for imposing a dividend restriction at this time. Accordingly, the portion of the *1979 Order* imposing a divi-

dend restriction on Lines must also be set aside.

## III. CONCLUSION

In 1963 the Commission determined that Greyhound should be subject to securities regulation because transportation and related activities provided its principal source of gross income. In 1974 the Commission decided that the regulation should continue because Greyhound's principal source of net income was from the same type of activity. In its *1979 Order*, the Commission abandoned any reliance on the principal source of income test and instead concluded that continued regulation of Greyhound's securities is justified because the carrier subsidiary has a substantial impact on national transportation. The failure to provide an adequate explanation for the ·change in tests applied, in terms of policy change, precedent or factual circumstances peculiar to Greyhound, is fatal to this portion of the Commission's *1979 Order*.

■ Eight years have passed since Greyhound first requested modification of the 1963 order. The Commission has had ample time and opportunity to provide a reasoned explanation of the decision to continue the exercise of its securities jurisdiction. We find no useful purpose to be served by allowing the Commission another shot at the target. *See Office of Communication of the United Church of Christ v. FCC*, 425 F.2d 543, 550 (D.Ċ.Cir. 1969). Similarly, in imposing a dividend restriction the Commission failed to meet the statutory requirement of "good cause"—whether it be change in policy, precèdent or unusual factual circumstances—for modifying the 1963 control order. Accordingly, the Commission's order must be set aside in its entirety. Under the circumstances present in this case, we see no just alternative but to remand the case to the ICC with directions to release Greyhound from the

---

20. *See, e.g., Arkansas Best Freight System, Inc. —Control—Delta Motor Lines, Inc.*, 93 M.C.C. 474, 484 (1963), *modified on other grounds*, 103 M.C.C. 621 (1967) (overcapitalization); *Hennis Freight Lines, Inc.—Pur.—Hancock—Trucking,* *Inc.*, 101 M.C.C. 245, 254 (1965) (excessive debt-equity ratio); *American Export Industries, Inc.—Investigation of Control of R.C. Motor Lines, Inc.*, 116 M.C.C. 851, 866 (1974) (parent in weak financial condition).

Commission's securities jurisdiction. The Commission is also directed to refrain from reopening the proceedings in this case unless and until circumstances arise that, consistent with this opinion, warrant further proceedings.

*It is so ordered.*