Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 20, 2004        Decided July 16, 2004

No. 03-1265

MICHAEL J. MARRIE AND BRIAN L. BERRY,
PETITIONERS

v.

SECURITIES AND EXCHANGE COMMISSION,
RESPONDENT

On Petition for Review of an Order of the
Securities and Exchange Commission

*Michael F. Perlis* argued the cause for petitioners. With him on the briefs was *Wrenn E. Chais.*

*Michael A. Conley*, Attorney, Securities & Exchange Commission, argued the cause for respondent. With him on the brief were *Giovanni P. Prezioso*, General Counsel, and *Eric Summergrad*, Deputy Solicitor.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: HENDERSON, ROGERS and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This appeal challenges an opinion and order of the Securities and Exchange Commission denying two certified public accountants the privilege of practicing before the Commission. It revisits the question of whether the Commission has articulated a clear standard for a finding of "improper professional conduct" under Rule 102(e) of its Rules of Practice, 17 C.F.R. § 201.102(e). We conclude that the lack of clarity identified in the two *Checkosky v. SEC* opinions of the court, 23 F.3d 452 (D.C. Cir. 1994) ("*Checkosky I*"), and 139 F.3d 221 (D.C. Cir. 1998) ("*Checkosky II*"), was not rectified until Rule 102(e) was amended in 1998. As amended, Rule 102(e) establishes that one of the mental states required for a finding of "improper professional conduct," is recklessness, defined as an extreme departure from the standard of ordinary care for auditors. Although the rule is clear now, because it was unclear at the time of the sanctioned conduct in 1994 and the Commission's application of the amended Rule is impermissibly retroactive, we grant the petition for review.

## I.

Michael Marrie and Brian Berry, as employees of the accounting firm, Coopers & Lybrand LLP ("Coopers"), acted as engagement partner and manager, respectively, for Coopers' 1994 audit of California Micro Devices, Inc. ("Cal Micro"), which designs, manufactures, and distributes electric circuits and semiconductors. As engagement partner and engagement manager, Marrie and Berry were responsible for ensuring that the 1994 fiscal year audit of Cal Micro was conducted in accordance with generally accepted auditing standards ("GAAS"), and that the financial statements filed with the Securities and Exchange Commission were in conformity with generally accepted accounting principles ("GAAP"). They prepared an audit plan and began field work in July 1994, and on September 29, 1994, filed with the

Commission the company's Form 10–K annual financial report for the fiscal year ending June 30, 1994.

Marrie and Berry conducted the audit against a backdrop of massive financial reporting fraud by Cal Micro, unknown to the accountants. The Commission found that in fiscal year 1994, the company fraudulently recognized revenue and receivables for the sale of unshipped or non-existent products, even though its stated policy was to recognize revenue for products only upon shipment to customers; falsified sales records, invoices, and shipping documents, such as shipping merchandise to fictitious customers; and improperly overstated net assets and income, while understating net loss. Cal Micro had attempted to make reported revenues as high as possible in order to maintain the impression of growth after it had lost one of its major customers, Apple Computer Inc., which had accounted for 32% of the company's total product sales the prior year. To avoid detection for improper revenue recognition, Cal Micro's management attempted to "clean" the company's books before the end of the fiscal year, informing Marrie and Berry that it had decided to issue approximately $12 million in credit to "write off" certain accounts receivable. On August 4, 1994, however, Cal Micro issued a press release announcing its net income and earnings for the fourth quarter of 1994, and stated that it was writing off $8.3 million, not $12 million of accounts receivable, $1.3 million of which was written off as bad debt expense. Because amounts written off for returned products would be deducted directly from reported revenues, while amounts written off as bad debt would be treated as expenses and would not decrease reported revenues, Cal Micro attempted to maximize the portion of the write-off allocated to bad debt expense. Following the August 4, 1994 press release, however, Cal Micro's stock price dropped and shareholders brought a lawsuit alleging accounting improprieties.

Regardless, on August 25, 1994, Marrie and Berry, on behalf of Coopers, presented their independent accountants' report addressed to Cal Micro's shareholders and directors, stating that Cal Micro's financial statements complied with GAAP and that the audit had been conducted in accordance

with GAAS. Following an independent investigation, Cal Micro filed a revised financial report with the Commission on February 6, 1995, showing a net loss of $15.2 million instead of earnings of $5 million, total revenue of $30.1 million rather than the previously reported $45.3 million, accounts receivable of $6.3 million instead of $16.9 million, $5.1 million in inventories instead of $13.9 million, and net property and equipment of $7.4 million instead of the previously reported $10.4 million.

On August 10, 1999, just shy of five years after Marrie and Berry presented the audit report to Cal Micro's shareholders, the Commission, through the Division of Enforcement and Office of the Chief Accountant, instituted disciplinary proceedings against Marrie and Berry pursuant to Rules 102(e)(1)(ii) and 102(e)(1)(iv)(A). The Commission alleged that Marrie and Berry had engaged in improper professional conduct in that they each "violated GAAS by failing to exercise appropriate professional skepticism, obtain sufficient competent evidential matter, or adequately supervise field work" in connection with three aspects of the 1994 audit: (1) the write-off of $12 million of accounts receivable; (2) the confirmation of the accounts receivable; and (3) the accounting of the sales returns and allowances for sales returns. The Commission also claimed that Marrie's and Berry's failures to examine the write-off, to investigate discrepancies in the confirmation responses, and to analyze Cal Micro's sales returns and the adequacy of its allowance for returns, were "an extreme departure from professional standards." Further, according to the Commission, Marrie and Berry were reckless in ignoring "unmistakable red flags" that indicated potential accounting irregularities in the areas of revenue recognition, accounts receivable confirmations, sales returns, sales cutoff, and cash collections. As a result, the Commission alleged that Cal Micro's financial statements for the fiscal year 1994 were materially false and misleading and were not prepared in conformity with GAAP.

On September 21, 2001, an administrative law judge ("ALJ") dismissed the charges, finding that Marrie and Berry had not engaged in improper professional conduct within the

meaning of Rule 102(e). The ALJ ruled that reckless conduct under Rule 102(e)(1)(iv)(A) "must approximate an actual intent to aid in the fraud being perpetrated by the audited company," and that the Commission had failed to prove that Marrie's and Berry's conduct had been reckless. *In re Marrie,* Initial Decision of the ALJ, Release No. 101, File. No. 3–9966, at 35, 81 (Sept. 21, 2001)("*In re Marrie I*"). On July 29, 2003, the Commission reversed the dismissal of the charges and imposed remedial sanctions barring Marrie and Berry from practicing before the Commission, subject to Rule 102(e)(5)'s provision for reinstatement. *See* 17 C.F.R. § 201.102(e)(5). In sanctioning Marrie and Berry, the Commission stated that "[t]he question is not whether an accountant recklessly intended to aid in the fraud committed by the audit client, but rather whether the accountant recklessly violated applicable professional standards. Recklessness, then, can be established by a showing of an extreme departure from the standard of ordinary care for auditors." *In re Marrie,* Exchange Act Release No. 48246, 2003 WL 21741785 at *11–*12 (July 29, 2003) ("*In re Marrie II*"). According to the Commission, proof of an actual intent to defraud or assist in a fraud was not required. *Id.* at *12. Nor was it necessary to show that the auditor had filed a "materially" misleading document: "An auditor who fails to audit properly under GAAS should not be shielded because the audited financial statements fortuitously are not materially misleading." *Id.* at *13. Finally, the Commission did not consider a good faith defense. The Commission found that Marrie and Berry recklessly violated fundamental principles of audit work, failed to exercise due care and appropriate professional skepticism, and failed to collect sufficient competent evidential matter to provide a basis for the audit opinion with respect to Cal Micro's write-off, accounts receivable, and sales returns. *Id.* at *30.

## II.

Rule 102(e), 17 C.F.R. § 201.102(e), provides the Commission with a means to ensure that the professionals on whom it relies "perform their tasks diligently and with a reasonable

degree of competence." *Touche Ross & Co. v. SEC,* 609 F.2d 570, 582 (2d Cir. 1979). It is directed at protecting the integrity of the Commission's own processes, as well as the confidence of the investing public in the integrity of the financial reporting process. Recognizing the particularly important role played by accountants in preparing and certifying the accuracy of financial statements of public companies that are so heavily relied upon by the public in making investment decisions, the Commission, following the court's *Checkosky* opinions, adopted amendments to Rule 102(e) to specify under what circumstances accountants could be held liable under the Rule. Prior to the 1998 amendments, Rule 102(e) provided that:

> (1) Generally. The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it in any way to any person who is found by the Commission after notice and opportunity for hearing in the matter: (i) Not to possess the requisite qualifications to represent others; or (ii) *To be lacking in character or integrity or to have engaged in unethical or improper professional conduct*; or (iii) To have wilfully violated, or willfully aided and abetted the violation of any provision of the Federal securities laws or the rules and regulations thereunder.

17 C.F.R. § 201.102(e)(emphasis added). On June 12, 1998, in response to the court's holding in *Checkosky II,* 139 F.3d at 223, that the Commission had failed to articulate a clear standard for "improper professional conduct," the Commission proposed amendments to Rule 102(e) to set forth categories of conduct that would constitute "improper professional conduct." The amendments provided, among other things, that a finding of "improper professional conduct" could be made based on reckless conduct, as defined in the securities fraud context, *see SEC v. Steadman,* 967 F.2d 636, 641–42 (D.C. Cir. 1992); *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977), *cert. denied,* 434 U.S. 875 (1977), but with no accompanying requirement of an actual intent to defraud. The 1998 amendments, effective Novem-

ber 25, 1998, added the language in Rule 102(e)(1)(iv), which provides:

> With respect to persons licensed to practice as account-ants, 'improper professional conduct' under § 201.102(e)(1)(ii) means: (A) *Intentional or knowing conduct, including reckless conduct*, that results in a violation of applicable professional standards; or (B) Either of the following two types of negligent conduct:
>
> > (1) A single instance of highly unreasonable conduct that results in a violation of applicable professional standards in circumstances in which an accountant knows, or should know, that heightened scrutiny is warranted.
> >
> > (2) Repeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission.

17 C.F.R. § 201.102(e)(1)(iv)(emphasis added).

Marrie and Berry contend that the Commission impermissibly retroactively applied its "non-fraud based" recklessness standard to the Rule 102(e) proceedings for conduct occurring in 1994, and erred in finding recklessness where there was no knowing violation or intent to defraud. The Commission responds that retroactivity is not an issue because Rule 102(e)(1)(iv)(A) is consistent with its practice well before the misconduct at issue, and that in 1998 the Commission simply codified a standard that had been applied previously. It maintains that in borrowing the definition of recklessness from *Steadman*, 967 F.2d at 641–42, and *Sundstrand*, 553 F.2d at 1045, it was not required to import into its Rule the requirement in those cases of actual knowledge of fraud. In its brief, the Commission states that the applicable professional standards at issue in the Rule are "indisputably not fraud-based." Respondent's Br. at 25.

## A.

The court has engaged in an extended dialogue with the Commission about its standard for sanctioning professionals

for "improper professional conduct." The court has twice concluded that the Commission had failed to articulate an intelligible standard for "improper professional conduct" under Rule 2(e)(1)(ii), the predecessor to Rule 102(e), and had failed to specify what mental state was required for a violation of the Rule. In *Checkosky I*, 23 F.3d at 460–62, where there was no majority opinion, Judge Silberman, writing separately, referred to two unreconciled lines of Commission authority—one based on negligence, the other on recklessness—regarding whether a professional acting in good faith could be subject to discipline for improper professional conduct. The Commission had stated that "a mental awareness greater than negligence [wa]s not required," *Checkosky I*, 23 F.3d at 459, but also "note[d]" that the accountants' conduct rose to the level of recklessness. *Id.* at 460. The judge concluded it was unclear both whether simple negligence could constitute a violation of the Rule, and also whether recklessness meant a "higher form of ordinary negligence," or "a lesser form of intent," as defined in *Steadman*, 967 F.2d at 641–42, and *Sundstrand*, 553 F.2d at 1045. *See Checkosky I*, 23 F.3d at 460. Those cases defined recklessness as "not merely a heightened form of ordinary negligence," but "an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Steadman*, 967 F.2d at 641–42 (citations omitted); *Sundstrand*, 553 F.2d at 1045. In *Steadman*, the court stated that this type of recklessness was "a lesser form of intent." *Steadman*, 967 F.2d at 642 (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)).

Judge Randolph, by contrast, concluded that there was no ambiguity with regard to the Commission's finding that negligence sufficed for a violation of Rule 2(e)(1)(ii), *id.* at 480, but that the Commission had failed adequately to justify its ruling that accountants could be suspended from practice under Rule 2(e)(1)(ii) without any proof of an intent to defraud or bad faith. *Id.* at 479. Referring to the Commission's decision in *In re Carter*, [1981 Transfer Binder] Fed. Sec. L. Rep.

(CCH) ¶ 82,847 (Feb. 28, 1981), involving a Rule 2(e) proceeding against lawyers, he concluded that the Commission had failed adequately to justify why auditors, but not lawyers, could be found to have engaged in "improper professional conduct" without proof of an intent to defraud. *Id.* at 483–85. As the language of Rule 2(e)(1)(ii) drew no distinction between professionals, applying to "any person" who practices before the Commission, *id.* at 485, and the definitions from the federal securities laws did not make culpability turn on the nature of the professional, *id.* at 486, he reasoned that the Commission was obligated in changing course to supply a reasoned analysis, which it had failed to do. *See id.* at 487. Because he concluded that the Commission had acted arbitrarily and capriciously, vacation of the Commission's order was required in his view rather than the simple remand to the Commission that was favored by Judge Silberman and adopted by the court. *Id.* at 454, 467.

On remand the Commission provided a further explanation, then affirmed the suspension of the accountants. But, in *Checkosky II*, 139 F.3d at 226, the court concluded that the Commission had still failed to provide "a uniform theory as to the necessary mental state for a violation of Rule 2(e)(1)(ii)." In the court's view, the Commission on remand had simultaneously embraced and rejected standards of recklessness, negligence, and strict liability, with no guidance as to which standard it had relied upon in finding a violation of the Rule. *Id.* at 223. Although the Commission first appeared to rely on a theory of recklessness, it proceeded to state that it was treating recklessness as relevant only to the sanction, that Rule 2(e)(1)(ii) did not mandate a particular mental state, and that negligence could, "under certain circumstances, constitute improper professional conduct." *Id.* at 224 (citations omitted). The Commission did not define those circumstances with any degree of specificity, and offered no further definition of negligence than those deviations from GAAP or GAAS that "threaten the integrity of the Commission's processes." *Id.* This left open the possibility, the court observed, that the standard might not even require a showing of negligence, for there was no way of knowing in advance what

kind of errors — non-negligent, innocent mistakes or isolated, serious deviations from GAAS or GAAP — would meet this standard. *Id.* at 224–25. In addition, the court concluded the Commission had again failed to articulate a clear standard for the mental state required to violate Rule 2(e)(1)(ii). *Id.* at 225. For these reasons, the court observed that "the Commission's statements come close to a self-proclaimed license to charge and prove improper professional conduct whenever it pleases, constrained only by its own discretion (combined, perhaps, with the standards of GAAS and GAAP)." *Id.* Because of "strong signs" that the Commission was unlikely to provide a uniform theory "anytime soon," the court remanded with instructions to dismiss the charge. *Id.* at 226–27.

**B.**

Congress has codified Rule 102(e)(1) as amended in 1998 in the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 78d–3, and we begin with the observation that in the amended Rule 102(e), the Commission has cured the defects identified in *Checkosky I* and *II*. Absent such a conclusion, there would be no need to address Marrie's and Berry's retroactivity contentions for, once again, the Rule would be unclear.

The amended Rule clearly sets out the standard for when an accountant is deemed to have engaged in "improper professional conduct." It provides that "improper professional conduct" means "[i]ntentional or knowing conduct, including reckless conduct that results in a violation of applicable standards." 17 C.F.R. § 201.102(e)(1)(iv)(A). It also identifies two types of negligent conduct that would warrant sanctions. *Id.* § 201.102(e)(1)(B). In its accompanying explanation of the amended Rule, the Commission stated that "for purposes of consistency under the federal securities laws," it was adopting the *Sundstrand/Steadman* definition of recklessness used for substantive violations of the securities laws. *Amendments to Rule 102(e) of the Commission's Rules of Practice,* Fed. Sec. L. Rep. (CCH) ¶ 86,052, at 80,844 (Oct. 19, 1998) ("*Adopting Release*"). Thus, recklessness means "not merely a heightened form of ordinary negligence," but "an

extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the (actor) or is so obvious that the actor must have been aware of it." *Id.* The Commission added, "This recklessness standard is a lesser form of intent." *Id.* However, it emphasized that the standards for finding a violation of professional conduct were "not fraud based," *id.,* indicating that the elements for violations of professional practice would not be identical to that of the federal securities laws. In explaining the amended Rule, the Commission also rejected suggestions that filing a materially false or misleading document should be a threshold requirement for a finding of improper professional conduct, concluding that, "[a]n auditor who fails to audit properly under GAAS . . . should not be shielded because the audited financial statements fortuitously turn out to be accurate or not materially misleading." *Id.* at 80,847. Finally, the Commission stated that good faith, although it may remain relevant in determining the appropriate sanction, would not be a defense to reckless conduct, because good faith would be "inconsistent with a finding of knowing or intentional, including reckless, conduct." *Id.* at 80,849. Thus, as of November 25, 1998, when the amendments took effect, the Commission provided a uniform theory of the necessary mental state required for a finding of improper professional conduct, *see Checkosky II*, 139 F.3d at 225, defined recklessness, and specified the types of negligent conduct that would result in a violation of the Rule. *See Checkosky I*, 23 F.3d at 459–60 (Silberman, J.). Further, in amending the Rule, the Commission's accompanying statement eliminated any lack of clarity as to good faith created by its precedents. *See, e.g., Checkosky I*, 23 F.3d at 458 (Silberman, J.).

The language and history of the amended Rule support the Commission's interpretation that "recklessness" under that Rule can be demonstrated simply by evidence of "an extreme departure from the standard of ordinary care for auditors." *In re Marrie II,* at *14. In this case, the Commission explained that "[a]dherence to applicable professional auditing standards protects the Commission's processes regardless

of whether a fraud has been committed." *Id.* The Commission further explained in *In re Marrie II* that "[r]equiring proof of a mental state approximating an actual intent to aid in the fraud committed by the audited company would conflict with this purpose and fail to protect the Commission's processes from accountants who lack competence to appear before it." *Id.* The Commission reasoned that a non-fraud based standard was warranted given the heavy reliance that it and the public placed on accountants "to assure disclosure of accurate and reliable financial information as required by the federal securities laws." *Id.* Although it stated in a cryptic footnote that the "concept of materiality" continued to be relevant, *see id.* at \*13 n.18, it explained that the Rule did not require a showing that the financial statements filed by the accountants be false or materially misleading, for the Commission's concern was to protect the integrity of its processes and investor confidence in its markets. *Id.* at \*12–\*13. Thus, "[a]n auditor who fails to audit properly under GAAS should not be shielded because the audited financial statements fortuitously are not materially misleading. An auditor who skips procedures designed to test a company's reports or looks the other way despite suspicions is a threat to the Commission's processes." *Id.* at \*13.

The 1998 amendments reflect choices that the Commission was authorized to make in promulgating its Rule, and Marrie and Berry do not contend to the contrary. Instead, they contend that the Commission took "diametrically opposite positions" in explaining the 1998 amendments and in its holding in their case. They proceed on the basis that the Commission's adoption of the *Sundstrand/Steadman* definition of recklessness also required inclusion of a fraud element. But, in contending that they could not be found culpable absent a finding of conscious or deliberate conduct, which the Commission conceded was lacking, their premise is faulty. The Commission's authority to discipline professionals has long been distinguished from the execution of its substantive enforcement functions. *See Touche Ross*, 609 F.2d at 579. Marrie and Berry proceed under the erroneous assumption that because the Commission borrowed the definition of reck-

lessness used in substantive anti-fraud provisions, it also was required to adopt other elements of a securities fraud violation into Rule 102(e)(1)(iv)(A), such as the requirements of an intent to defraud and materiality. As explained in *Checkosky I*, however, Rule 2(e), the predecessor to Rule 102(e), was "analytically distinct from substantive provisions of the securities laws," and cases such as *Steadman,* 967 F.2d at 641–42, which involved those provisions, were not determinative in the analysis of whether improper professional conduct had occurred. *See Checkosky I*, 23 F.3d at 456 (Silberman, J.). Their contention, therefore, that recklessness must involve deliberate or conscious conduct by an auditor, fails to appreciate that the *Sundstrand/Steadman* line of cases addressed violations of Section 10(b) of the Securities and Exchange Act and Rule 10b–5 that were targeted specifically at securities fraud. Here, the Commission did not, and did not need to, charge fraud or aiding and abetting the fraud of Cal Micro, but instead charged Marrie and Berry on the basis of formulated standards of professional practice designed to protect the Commission's processes.

No more problematic is Marrie's and Berry's contention that the amended Rule is arbitrary and capricious, *see* 5 U.S.C. § 706, or unconstitutionally vague, *see Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156–57 (D.C. Cir. 1986), by failing to provide fair warning of the conduct it prohibits or requires, and by incorporating an elastic concept of recklessness that opens the door to second-guessing of accountants' judgment calls. Because of "[t]he complexity of [GAAP] and [GAAS]," *see Checkosky I*, 23 F.3d at 479 (Randolph, J.) (quoting James F. Strother, *The Establishment of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards,* 28 Vand. L. Rev. 201, 203 (1975)), calling for "[j]udgments [to] be made about specific transactions" about which auditors could disagree, defining "recklessness" in the context of audits entails obvious difficulties. *See id.* (citing Jerry Sullivan et al., *Montgomery's Auditing* 19 (10th ed. 1985)). In the 1998 amendments, however, the Commission has specified the applicable intent standard and has limited the occasions

where it will find sanctionable conduct to "extreme departure[s]" from professional standards that demonstrate that an accountant lacks competence to practice before the Commission. *Adopting Release*, at 80,844. It cannot be gainsaid that the Commission could reasonably conclude that any licensed accountant is on notice of professional standards generally and of what constitutes extreme departures in particular. For this reason, professional disciplinary Rules have withstood vagueness challenges. *See, e.g., United States v. Hearst,* 638 F.2d 1190, 1197 (9th Cir. 1980). The duties to exercise due care, *see* American Institute of Certified Public Accountants ("AICPA"), *Codification of Statements on Auditing Standards*, AU § 230.02, to obtain sufficient evidential matter, *see id.* AU § 150.02, and to exercise professional skepticism, *see id.* AU § 316.16, are "standards to which all accountants must adhere." *Potts v. SEC,* 151 F.3d 810, 813 (8th Cir. 1998). *See In re Potts,* 53 S.E.C. 187, 196–97 (Sept. 24, 1997); s*ee also Ponce v. SEC,* 345 F.3d 722, 739 (9th Cir. 2003); *Checkosky I,* 23 F.3d at 472 (Randolph, J.). Rule 202 of AICPA's Code of Professional Conduct recognizes the *Codification of Statements on Auditing Standards* as an interpretation of GAAS. As the Commission explained in the instant case, professional misconduct constituting an extreme departure occurs, for instance, when an auditor "skips procedures designed to test a company's reports or looks the other way despite suspicions." *In re Marrie II,* at *13. The Commission's standard for recklessness, then, as guided and limited by generally accepted standards of the profession, does not entail arbitrary subjective second-guessing of auditing judgment calls.

To the extent that Marrie and Berry point out that GAAS did not "technically" require them to audit the write-off, they miss the point. The Commission did not fault them for failing to audit the write-off, but with failing to exercise the requisite professional skepticism. The Commission concluded that the necessary professional skepticism was lacking because they failed to follow up on their own request that Cal Micro provide a documented analysis of the $12 million write-off, even though they were well aware that the write-off was

unusually large and had occurred near the end of the fiscal year. Under GAAS, accountants must test "transactions that are both large and unusual, particularly at year-end." AICPA, AU § 316.20. As certified public accountants, Marrie and Berry were deemed to understand the need to obtain adequate documentation to support a write-off of such a staggering amount, and, indeed, their call for documentation evinced an appreciation of what was required of them in conducting the audit. Under the circumstances, the Commission could reasonably conclude that their failure to obtain the necessary documentation was an extreme departure from professional standards.

For these reasons, we conclude Marrie and Berry have failed to show that the Commission's amended Rule is arbitrary or capricious or unconstitutionally vague.

## C.

Turning to the Commission's application of amended Rule 102(e) in this case, we hold, in light of *Checkosky I* and *II*, that the Commission erred in applying its non-fraud Rule retroactively, for there was no "ascertainably certain" standard for finding "improper professional conduct" under Rule 102(e) in the summer of 1994 when Marrie and Berry audited Cal Micro. *See General Elec. Co. v. EPA,* 53 F.3d 1324, 1330 (D.C. Cir. 1995). Fair notice of the standards against which one is to be judged is a fundamental norm of administrative law: "[t]here is no justification for the government depriving citizens of the opportunity to practice their profession without revealing the standard they have been found to violate." *Checkosky II,* 139 F.3d at 225–26. "Given the enormous impact on accountants . . . that the Rule has, and in fairness to petitioners, the Commission must be precise in declaring the standard against which petitioners' conduct is measured." *Checkosky I*, 23 F.3d at 462 (Silberman, J.). *See id.* at 479 (Randolph, J.); *see also Checkosky II*, 139 F.3d at 227. As late as March 27, 1998, when *Checkosky II* was decided, the court concluded that the Commission had failed to articulate an intelligible standard for what constituted "improper pro-

fessional conduct," and had failed to specify the state of mind necessary for a violation of the Rule. Marrie and Berry, therefore, were not on notice in the summer 1994 either of the contours of the Commission's recklessness standard or that they could be barred from practice before the Commission without proof of intent to defraud or lack of good faith. While the Commission maintains that as certified public accountants, Marrie and Berry knew that they would be held to certain professional standards, such as GAAS and GAAP, this was no less true for the petitioners in *Checkosky I* and *II*, whom the court determined were nevertheless entitled to more specific guidance as to the Commission's interpretation of the Rule.

Further, we cannot agree with the Commission that it did not retroactively apply a new recklessness standard. In *Landgraf v. USI Film Products,* 511 U.S. 244, 269 (1994), the Supreme Court set out the standard for retroactivity. A statute is not retroactive merely because it is applied in "a case arising from conduct antedating the statute's enactment;" rather, the operative inquiry is "whether the new provision attaches new legal consequences to events completed before its enactment." *Id.* at 269–70. The Court observed that "familiar considerations of fair notice, reasonable reliance, and settled expectations" should offer guidance in those hard cases where a finding of retroactivity requires balancing "the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event." *Id.* at 270. In the administrative context, this court in *National Mining Association v. Department of Labor,* 292 F.3d 849, 859 (D.C. Cir. 2002), held that "a rule is retroactive if it 'takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past.'" (quoting *Ass'n of Accredited Cosmetology Sch. v. Alexander,* 979 F.2d 859, 864 (D.C. Cir. 1992)).

In applying the amended Rule 102(e) to Marrie's and Berry's conduct in 1994, the Commission has imposed new legal consequences and new legal duties: the elimination of

the good faith defense and of the requirement that materiality be proved by showing that a false or misleading financial statement had been filed. Prior to the 1998 amendments, the court concluded it was unclear whether good faith could be a defense to recklessness or a finding of improper professional conduct, as evidenced by conflicting lines of Commission precedents. *See Checkosky I,* 23 F.3d at 458 (Silberman, J.). Several Commission opinions suggested that absent knowing conduct, good faith was a defense to recklessness. For instance, in *In re Logan,* 10 S.E.C. 982 (1942), the Commission indicated in *dictum* that good faith was a defense, and in *In re Carter,* [1981 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 82,847, at 84, 145 (Feb. 28, 1981), the Commission stated that lawyers "acting in good faith and exerting reasonable efforts to prevent violations of the law" could not be held liable for violation of Rule 2(e)(1)(ii). However, in *In re Haskins & Sells,* Accounting Series Releases No. 73, [1937–1982 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 72,092, at 62,197 (Oct. 30, 1952), the Commission stated that good faith was not a defense, at least for auditors, to a Rule 2(e) proceeding. *See also In re Schulzetenberg,* Admin. Proc. 3–6881, slip op. at 2 (Nov. 10, 1987) (unpublished) (same). *But see Checkosky I,* 23 F.3d at 459 (Silberman, J.), 482 (Randolph, J.).

Given Commission precedent and our own, the Commission's statement in adopting the 1998 amendment to Rule 102(e) that good faith was not a defense, *see* Rule 102(e)(1)(ii), and that "[s]ubjective good faith is inconsistent with a finding of knowing or intentional, including reckless, conduct," *Adopting Release*, at 80,849, imposed new legal consequences. At the time of the 1994 audit, Marrie and Berry did not have fair notice that they could be sanctioned for improper professional conduct even if they had been acting in good faith. In view of the Commission's prior opinions and, even assuming they predicted the Commission would adopt the *Sundstrand/Steadman* recklessness standard, they had reason to believe that recklessness required proof of either an intent to defraud or a reckless disregard of their legal obligations. *See Steadman,* 967 F.2d at 641–42. Indeed, the ALJ interpreted

the *Sundstrand/Steadman* recklessness standard, as adopted by the Commission for Rule 102(e) violations, to include a requirement of an actual intent to defraud.

The Commission also changed the legal landscape in applying the amended definition of recklessness to Marrie's and Berry's conduct in 1994 when it altered the element of materiality. The Rule, as it is now interpreted, does not require a showing of false or misleading financial statements. In maintaining that it had always abided by the *Sundstrand/Steadman* definition of recklessness, *see* Respondent's Br. at 34, the Commission was bound to apply the materiality requirements of those cases or make clear that it was adopting a different requirement. The court in *Sundstrand*, 553 F.2d at 1045, held that reckless omissions of material facts upon which others had placed "justifiable reliance" would result in liability under the securities laws. *Id.* at 1044. *See also Steadman*, 967 F.2d at 640–41. In the securities fraud context, an omission was defined as material "if there was a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). In the instant case, however, the Commission stated that recklessness could be found without a finding of this type of materiality, namely, the filing of "false financial statements" and financial statements that contain a "material misstatement." *In re Marrie II*, at *13. Until the 1998 amendments to Rule 102(e), the Commission had not clarified that this type of materiality would no longer be required to find recklessness under Rule 102(e), and Marrie and Berry could not be held to have known of the change at the time of the audit.

Notwithstanding these altered requirements for proving unprofessional conduct as a result of recklessness, the Commission contends that the amended Rule is not impermissibly retroactive because it "is substantively consistent with prior regulations or prior agency practices, and has been accepted by all Courts of Appeals to consider the issue." *Nat'l Mining*, 292 F.3d at 860. There are several problems with the Commission's position. First, its statement is untrue because

it ignores this court's *Checkosky* opinions, which declared the Commission's earlier approach too unclear to enforce. The Commission's related contention that, even absent the altered requirements of the amended Rule, Marrie and Berry could have been sanctioned because the Commission found both that they had acted with a lesser form of intent and that they cannot have acted in good faith, *see In re Marrie II* at \*11; *Adopting Release*, at 80,849, simply repeats the Commission's claim that the type of reckless misconduct engaged in by Marrie and Berry had always been a basis for discipline under Rule 102(e) and its predecessors. Yet, prior to the amended Rule, the court in *Checkosky I* and *II* determined that the Commission had not been "precise in declaring the standard against which [accountants'] conduct is measured." *Checkosky I*, 23 F.3d at 462 (Silberman, J.); *see also Checkosky II*, 139 F.3d at 227.

Second, the cases cited in the Commission's opinion for the proposition that the amended Rule 102(e) simply codified its longstanding use of the recklessness standard were decided after Marrie's and Berry's sanctioned conduct. *See, e.g., In re Ponce*, Exchange Act Release No. 43235 (Aug. 31, 2000), 73 S.E.C. Dkt. 442, 465 n.52, *aff'd*, 345 F.3d at 741–42. The one exception, *In re Jackson*, 48 S.E.C. 435 (Jan. 21, 1986), neither defined recklessness nor specified the standard for finding a violation of applicable professional standards, and, in any event, was applying a rule that the court in *Checkosky I* and *II* concluded failed to give fair notice. While in 1997 the Commission in *In re Potts*, 53 S.E.C. at 204 n.40, applied the same *Sundstrand/Steadman* definition of recklessness as adopted by the Commission in the amended Rule 102(e) and, by its opinion, gave notice that a finding of recklessness could be made without a finding of fraudulent intent, its opinion postdated by three years Marrie's and Berry's sanctioned conduct and the filing of their Form 10–K report to the Commission. Moreover, the court in *Checkosky II*, 139 F.3d at 226, observed that even in *Potts*, the Commission failed "to settle on a uniform theory as to the necessary mental state for a violation of [the] Rule" (referring to Rule 102(e)'s predecessor). In addition, in *Potts*, although the Commission

discussed an auditor's duties under GAAS to determine whether financial statements contained material misstatements, *see* 53 S.E.C. at 196–97, it failed to clarify whether, by adopting the *Sundstrand/Steadman* definition of recklessness, it was also adopting the element of materiality required in the securities fraud context.

The court is constrained to hold, in light of *Checkosky I* and *II*, that regardless of whether the evidence showed that Marrie's and Berry's conduct in auditing Cal Micro was reckless under Rule 102(e) because it involved extreme departures in professional standards, the Commission's recklessness standard was unclear in the summer 1994 when Marrie and Berry conducted the audit. Although the 1998 amendments to Rule 102(e) rectified the lack of clarity identified in *Checkosky I* and *II*, application of the amended Rule, which changed the legal landscape with respect to the standard for finding "improper professional conduct," to conduct in 1994 was impermissibly retroactive. Accordingly, we grant the petition and reverse the Commission's opinion and order of July 29, 2003, without reaching the other challenges in the petition for review.